IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

UNITED STATES OF AMERICA )
)
v. ) No. 3:06-00154
) JUDGE CAMPBELL
JOSE EDUARDO URRIETA )

MEMORANDUM AND ORDER

I. Introduction

Pending before the Court is Defendant's Motion to Suppress Evidence and Statements (Docket No. 20). In his Motion, Defendant raises the following four issues: (1) did Deputy Young lack reasonable suspicion to conduct a *Terry* stop of Defendant Urrieta; (2) did Deputy Young overstep the bounds of *Terry* when he extended the traffic stop to investigate Defendant Urrieta's immigration status; (3) was Defendant Urrieta's consent to search the vehicles voluntary; and (4) were the incriminating statements elicited without a valid *Miranda* waiver?

By prior Order (Docket No. 28) of the Court, the Motion was denied on the issue of whether probable cause existed to conduct the traffic stop on August 21, 2006 and whether Defendant consented to the search of both the Navigator and Honda vehicles.

By prior Order (Docket No. 28), the Court also directed the parties to file supplemental briefs on the following two issues: (1) did Deputy Young overstep the bounds of *Terry* by extending the traffic stop to investigate Defendant Urrieta's immigration status; and (2) were the incriminating statements taken from Urrieta in violation of *Miranda.* The parties were directed to address Defendant's statements at the scene of the stop and after arrest both prior to and after *Miranda* warnings, and any other pending issues pertaining to the Motion to Suppress.

For the reasons set forth herein, Defendant's Motion to Suppress (Docket No. 20) is

GRANTED in part and DENIED in part.

## II.  Factual Background

The Court held an evidentiary hearing on the Motion on December 27, 2006 (hereinafter the "Hearing").  Deputy Lee Young ("Deputy Young") with the Rutherford County Sheriff's Office, Interstate Crime Enforcement Unit and Agent Tony Langeland ("Agent Langeland") with Immigration and Customs Enforcement testified on behalf of the Government at the Hearing. Defendant Urrieta ("Defendant") testified on his behalf at the Hearing.  A video of the traffic stop recorded by a video camera mounted on Deputy Young's patrol car (hereinafter the "Video") also was played at the Hearing.

Deputy Young testified that on August 21, 2006 at 1:49 p.m. he conducted a routine traffic stop of a vehicle being driven by Defendant (Transcript of Suppression Hearing on December 27, 2006 at pp. 5-6, hereinafter Docket No. 29).  Prior to the stop, Deputy Young had been sitting at the 81 mile-marker on I-24 observing eastbound traffic and saw a Lincoln Navigator towing a Honda out of the corner of his eye (Docket No. 29 at 12-13).  Deputy Young testified that he observed the Honda weaving out of control, fishtailing back and forth (Docket No. 29 at 12).  Deputy Young decided to pursue the Navigator and eventually caught up with Defendant at approximately the 87 eastbound mile-marker (Docket No. 29 at 13).  Deputy Young further testified that it appeared to him that the Honda was being towed with a homemade tow-bar which was bolted into the front bumper of the Honda through the plastic and attached to the Navigator causing damage to the Honda (Docket No. 29 at 13).  The Navigator did not display a valid registration on the rear, and there was no tail light system on the Honda that was being towed (Video at Hearing, Docket No. 29 at 16).

2

Deputy Young testified that when he walked up to the Honda, Defendant was smiling, and he was kind (Docket No. 29 at 16). Deputy Young further testified that there were two other people in the Navigator, Defendant's girlfriend and a 16 year old Hispanic male (Docket No. 29 at 11). The female was sitting in the front passenger seat and kept staring away from Deputy Young not wanting to make eye contact (Docket No. 29 at 17). She was dressed in what looked like a waitress' shirt (Docket No. 29 at 17). The young man in the back seat also keep staring off (Docket No. 29 at 17). Deputy Young explained that they looked like they had a lot of concern or were scared (Docket No. 29 at 17). The Video showed that Deputy Young asked Defendant for his license and registration (Video at Hearing). Defendant presented Deputy Young with a Mexican driver's license (Docket No. 29 at 12). Defendant also present Deputy Young with a sticker registration from the front windshield of the Navigator which was six months old and listed Ramirez Montes as owner of the vehicle (Docket No. 29 at 16). Deputy Young testified that he noticed that there was a lot of jumbled up stuff thrown into the back of the Honda and Navigator, and that the Honda was packed all the way to the top (Docket No. 29 at 10-11). Because of the amount of stuff in the back of the vehicle, Deputy Young inquired of Defendant whether they were moving (Docket No. 29 at 10, Video at Hearing). Defendant indicated to Deputy Young that they were moving to Atlanta (Docket No. 29 at 10, Video at Hearing).

At approximately 1:50 p.m., Deputy Young also asked Defendant for his passport and told Defendant to look for his passport while he checked to see if Defendant's Mexican driver's license was O.K. (Video at Hearing). Deputy Young explained that he asked Defendant for his passport because Defendant had presented him with a Mexican license and he needed to determine if the license was valid (Docket No. 29 at 11). Deputy Young further explained that it

was his understanding of the law that if Defendant had been in the United States over a year, his Mexican driver's license would be invalid (Docket No. 29 at 11).

The Video of the stop indicates that Deputy Young returned to his patrol car at approximately 1:52 p.m., and that Defendant began to search the back of the Honda for his passport (Video at Hearing). At approximately 1:53 p.m., Deputy Young proceeded to call EPIC, a Federal computer database that can determine any border crossings, investigations at the Federal level, and immigration status, including deportations and visas (Docket No. 29 at 15). According to Deputy Young, his dispatchers have trouble running international driver's licenses so he called EPIC to get the information he needed because they do it on a daily basis (Docket No. 29 at 16). Deputy Young had EPIC run both Defendant's name and the name of the purported owner of the car, Ramirez Montes, and indicated that Defendant was going to be charged with a lane violation and a registration violation (Video at Hearing). In response to Deputy Young's inquiry, EPIC indicated that it had no record of any border crossings by Defendant or any information on the tags of either of the vehicles, and that there was no record of ongoing investigations of any kind (Docket No. 29 at 19). Deputy Young testified that EPIC indicated they would call him back about the status of the Navigator's temporary registration, but that he did not think that EPIC was ever able to determine its status (Docket No. 29 at 52). Deputy Young further testified that the information from EPIC led him to believe that Defendant's driver's license was not good because EPIC did not find any evidence of any border crossings by Defendant within the last year (Docket No. 29 at 19). Officer Young's conversation with EPIC concluded at approximately 2:04 p.m. (Video at Hearing).

At approximately 2:06 p.m. Deputy Young requested back-up. Deputy Young indicated

he felt back-up was appropriate because his suspicions were pretty high by that time that based upon the information he received from EPIC, Defendant was not in the country legally and that something else was going on in the car other than Defendant traveling to Atlanta (Video at Hearing, Docket No. 29 at 19-21). Deputy Young explained that in addition to the information he received from EPIC, his concern arose from several factors, including the apparent discomfort of Defendant's girlfriend and the young man in the back of the car, the way the vehicles were packed, the apparent low value of the Honda that was being towed and the manner in which it was being towed, and the fact that Defendant was headed to Atlanta, a known distribution point for drug cartels from California and Texas (Docket No. 29 at 17-18).

At approximately 2:07 p.m., Deputy Young informed Defendant that there was no record of Defendant being in the country legally, and proceeded to question Defendant about the type of visa he held and how long he had been in the country (Docket No. 29 at 21). In response to Deputy Young's questioning about what type of visa he held, Defendant responded a tourist visa, but avoided telling Deputy Young when he came into the country and when he was going back to Mexico (Video at Hearing, Docket No. 29 at 21). Similarly, when Deputy Young questioned Defendant about whether he had a legal passport, Defendant simply responded that he was living with his girlfriend (Video at Hearing, Docket No. 29 at 21). At approximately 2:08 p.m., Deputy Young began to question Defendant about the legal status of his girlfriend (Video at Hearing). Defendant responded that he was unaware whether his girlfriend had a passport (Video at Hearing, Docket No. 29 at 22). Defendant also indicated that he and his girlfriend had been dating a couple of years (Docket No. 29 at 22). In addition, Defendant indicated that the Navigator belonged to his girlfriend and that the Honda belonged to him (Video at Hearing).

5

At approximately 2:09 p.m. Deputy Young began to question Defendant about his criminal history (Video at Hearing). Defendant indicated to Deputy Young that he had never been arrested for anything other than for leaving his I.D. at home (Video at Hearing). Defendant also indicated that he was not on probation or parole (Video at Hearing). In response to Deputy Young's questioning about what he did for a living, Defendant indicated that he did not have any steady work, and, after some stalling, that his girlfriend worked at Wendy's (Video at Hearing).

By now Deputy Young explained that his suspicions were rising because of the additional factors that the Navigator was not properly registered, and that Defendant and his girlfriend were driving an expensive insured car without any evidence of gainful employment or evidence of means necessary to finance a cross country trip or set up living in Atlanta (Docket No. 29 at 18 and 23-24). Deputy Young further explained that it is known that drug dealers will hire people that are going through hard times or misfortunes and are needing money to take a load of drugs to certain areas or even buy them vehicles (Docket No. 29 at 18). In addition, Deputy Young thought it suspicious that Defendant had been arrested once for not having his I.D. with him, and that he did not have any other paperwork with him except his Mexican driver's license (Docket No. 29 at 24).

At approximately 2:10 p.m. Deputy Young continued to question Defendant about where he was heading and whether he had a visa or passport. Defendant now indicated that he was going to Atlanta for only two months and that he had a passport somewhere in the Honda (Video at Hearing). Defendant also indicated in response to questioning by Deputy Young that there were no illegal drugs in the car, firearms or large sums of money. In addition, Defendant indicated that his girlfriend had purchased the Navigator in February (Video at Hearing). In

6

response to Deputy Young's questioning about why it was not licensed after almost six months, Defendant indicated that the dealer said they were going to send them the car registration, not the DMV (Video at Hearing).

At approximately 2:12 p.m., Deputy Young asked Defendant if anyone had ever used any kind of drugs or had any drugs in either one of the two cars that Deputy Young's drug dog would detect (Video at Hearing). Defendant indicated that he did not think so (Video at Hearing). Deputy Young explained that he perceived Defendant as stalling in his response (Docket No. 29 at 26). Deputy Young continued to push Defendant for information about whether he was carrying drugs, and Defendant responded to his questioning by saying that he really was going to West Palm Beach, Florida (Video at Hearing). Defendant indicated that he was not going to stay in Atlanta with his girlfriend, but was going to go to West Palm Beach for a week and then fly to Tijuana (Video at Hearing). Deputy Young explained that all of this made him very suspicious that there was something in the car (Docket No. 29 at 26 and 29).

At approximately 2:13 p.m., Deputy Young again asked Defendant if there was anything illegal in either of the vehicles and then asked Defendant for his consent to search the vehicles (Video at Hearing). Deputy Young gave Defendant a consent form in English and in Spanish and told Defendant to read over it and sign once he was done (Video at Hearing and Docket No. 29 at 28). At this point, Deputy Scott Lawson ("Deputy Lawson"), Deputy Young's back-up had arrived, and Deputy Young walked away from Defendant to speak to Deputy Lawson (Docket No. 29 at 29). Deputy Young explained at the hearing that Deputy Lawson speaks some Spanish, and that he wanted Deputy Lawson to ask Defendant's girlfriend, who did not speak English, some questions, such as where they were going, whether there were any illegal items in

7

the car, and for her consent to search the vehicle (Docket No. 29 at 29). At the hearing Deputy

Young explained that drug dealers will often take people that do not know each other and put

them in a car together to protect the load, and he wanted to determine how much Defendant and

his girlfriend really knew about each other, especially in light of the fact that Defendant had

indicated he had been dating his girlfriend for a couple of years but did not know her legal status

(Docket No. 29 at 22-23).

At approximately 2:15 p.m., Defendant handed Deputy Young the signed consent form

(Video at Hearing). Defendant only had included the Honda on the form and Deputy Young

indicated that he also wanted to search the Navigator (Video at Hearing). Defendant proceeded

to add the Navigator to the consent form and also consented for it to be searched (Docket No. 29

at 30; Video at Hearing). Deputy Young indicated to Defendant that it would take some time for

them to search both vehicles and asked Defendant to step back away from the vehicles, but not

near his patrol car because he had a drug dog in the back of it (Video at Hearing).

At approximately 2:17 p.m. Deputy Young re-joined Deputy Lawson who was talking to

Defendant's girlfriend (Video at Hearing). Deputy Lawson indicated to Deputy Young that the

girlfriend had indicated three times upon questioning by Deputy Lawson that they were on their

way to Atlanta (Video at Hearing). Deputy Young indicated that Defendant's girlfriend also had

consented to search the vehicle (Docket No. 29 at 68). Deputy Lawson remained with

Defendant's girlfriend and Deputy Young then approached the male passenger and asked

whether he consented to be searched (Video at Hearing). Both Defendant's girlfriend and the

male passenger were asked to exit the Navigator (Video at Hearing). At approximately 2:19

p.m., both Deputies began their search of the vehicles (Video at Hearing). At some point during

8

the search, another Deputy joined Deputy Young and Deputy Lawson (Video at Hearing).

The search of the vehicles revealed an unloaded .22 automatic handgun and some ammunition in the overhead console (Docket No. 29 at 32). The search of the vehicles also revealed a black bag behind the driver's seat which contained a loaded Colt .45 caliber pistol with a full magazine and an extra magazine with it, a bullet proof vest, a Westfield shotgun, with 100 rounds of ammunition, and some .22 and .45 ammunition (Docket No. 29 at 32). Defendant's very old passport, and fraudulent resident cards, permanent resident's card, and Social Security card were also found during the search (Docket No. 29 at 36).

After the guns were located inside the Navigator, Deputy Young called I.C.E. Agent Langeland and asked him if he was interested in looking at what they had found (Docket No. 29 at 35). Deputy Young testified that Agent Langeland indicated that he was interested, and Defendant, his girlfriend, the young male passenger and the Navigator and Honda were taken back to the Rutherford County Sheriff's Office (Docket No. 29 at 35). Deputy Young further testified that Agent Langeland met Deputy Young at the Rutherford County Sheriff's Office, and Defendant was placed in an interview room and questioned by Langeland (Docket No. 29 at 36-37). Deputy Young joined Langeland after the search of the vehicles was complete (Docket No. 29 at 37). On cross examination by the Defense, Deputy Young indicated that he never issued a citation in connection with the traffic stop, but only started to write a warning citation which he did not give to Defendant (Docket No. 29 at 50 and 54). Deputy Young testified that he began writing the citation at 2:10 p.m. and that the citation was written for a lane violation, a traffic control device violation (lack of tow lights) and invalid registration (Docket No. 29 at 50-52). Deputy Young also testified that he did not write the citation for a driver's license violation

9

because he did not know whether the license was valid or not (Docket No. 29 at 52-53). Deputy Young further testified that he continued to question Defendant about his immigration status past the point of writing the citation because Defendant told him he had a valid passport when EPIC indicated that it did not have a record of Defendant coming into the country legally (Docket No. 29 at 54). Deputy Young explained that he felt that if Defendant were lying about his possession of a valid passport, he may be lying about something else and it was his job to further investigate his suspicions that there was something wrong in connection with the traffic stop (Docket No. 29 at 54-55, 57). Deputy Young testified that while he had a drug dog in the car and had suspicions that the car might be transporting illegal drugs, he did not run his dog around Defendant's car until it was brought back to the station (Docket No. 29 at 58). Deputy Young reiterated upon cross examination that he was concerned that Defendant was involved in some type of illicit activity and cited his suspicions as: (1) evidence of a quick trip from a source city and state for drug activity; (2) a subject that is telling him he has a valid passport that he cannot find and no evidence of whether Defendant has a valid driver's license or not; (3) a vehicle that is being towed in disregard to the vehicle and public safety; (4) occupants of the vehicle that appeared to be scared; and (5) Defendant's evasiveness about his status in this country (Docket No. 29 at 60-62). Finally, Deputy Young testified on cross-examination that Defendant was not free to leave at any point during the traffic stop and that he was not Mirandized until he was questioned by Agent Langeland (Docket No. 29 at 37-38 and 63).

Agent Langeland testified at the hearing that he was contacted by Deputy Young and asked if he was interest in coming to the station and checking into Defendant's situation (Docket No. 29 at 93). Agent Langeland indicated that he met Deputy Young and Defendant at the

10

Rutherford County Sheriff's Office, and that he conducted an interview of Defendant (Docket No. 29 at 92-92). Agent Langeland explained that he first questioned Defendant about his name, place of birth and status in the United States, and that Defendant indicated that he came into the United States in 1997 on a tourist visa (Docket No. 29 at 94). Agent Langeland further indicated that Defendant was not Mirandized prior to being questioned about his immigration status because he was merely establishing his identification and his alienage to see if he was in violation of an administrative law (Docket No. 29 at 95). Agent Langeland also testified that Defendant admitted that his visa had been cancelled in 1997 at the San Ysidro Port of Entry, but that he had been allowed to enter the United States by the Immigration Officer through the Port of Entry after his visa had been cancelled (Docket No. 29 at 96-97). Agent Langeland further testified that he was unable to find any legal entry into the United States by Defendant in any computer database (Docket No. 29 at 97).

At some point during questioning, Agent Langeland stopped discussing Defendant's immigration status and began to speak to him regarding possible crimes he had committed (Docket No. 29 at 98). At this point of the interview, Agent Langeland testified that he gave Defendant a printed version of his Miranda rights, both in Spanish and in English, and that Defendant signed the form acknowledging that he had been given his Miranda rights (Docket No. 29 at 99-100). Deputy Young was present while Defendant signed his Miranda waiver (Docket No. 29 at 101). After the Miranda waiver was signed, Agent Langeland and Defendant talked about the guns and weapons that were found during the search of the Navigator and the permanent resident card, a resident alien card and a Social Security card that were found during the search (Docket No. 29 at 101). Defendant admitted that the guns found during the search

11

were his, and that the three documents found during the search were purchased by him and not valid (Docket No. 29 at 101-103).

On cross-examination by the Defense, Agent Langeland testified that when he started to question Defendant it was to determine whether he was in the United States legally or illegally and to determine his immigration status (Docket No. 29 at 106). Agent Langeland further testified that Defendant was not free to leave during this preliminary questioning and that he was not given his Miranda rights (Docket No. 29 at 108-109). Defendant Langeland also testified that he did not believe that there was any questioning of Defendant about the firearms prior to his Miranda waiver (Docket No. 29 at 110). Defendant Langeland indicated that he began taking notes about the firearms at approximately 4:55 p.m, and that the Miranda waiver was signed by Defendant at approximately 5:08 p.m. (Docket No. 29 at 111-112). Agent Langeland explained the discrepancy between the time his notes indicated that he began to question Defendant about the firearms and the time the Miranda notice indicates Defendant waived his rights as being the time between when he sat down in the interview room, pulled the note pad in front of him and gave Defendant his notice of Miranda rights to the time Defendant reviewed the form, asked questions of Agent Langeland and signed the form indicating that he had waived his Miranda rights (Docket No. 29 at 114-115). Agent Langeland also testified that he explained to Defendant that he did not have to answer any of his questions regarding the illegal firearms and documents, and that his concern was that Defendant understood his statement of rights (Docket No. 129 at 119-120).

During his testimony, Agent Langeland also indicated that he did not have any difficulty conversing with Defendant in English (Docket No. 29 at 123). Finally, during his testimony,

Agent Langeland testified that it was his belief that under the Geneva Convention and or Convention on the Regulation of the Inter-American Automotive Traffic, to which Mexico is a signatory, a person may drive on a foreign driver's licenses only for one year after entry into the United States (Docket No. 29 at 93-94, 124).

After the close of the Government's proof, Defendant took the stand (Docket No. 29 at 127). Defendant was aided during his testimony by a translator. The Defense indicated that Defendant felt more comfortable using Spanish and hearing Spanish so he preferred the services of an interpreter despite being able to respond to a statement in English (Docket No. 29 at 127). Defendant also indicated that he needed a translator because he only understood 80% of what was being asked of him (Docket No. 29 at 143). Defendant testified that he was traveling from Sacramento, California to Palm Beach, Florida and that the Navigator was owned by Maria Ramirez Montes, his girlfriend (Docket No. 29 at 127-128). Defendant also testified that after the initial traffic stop, Deputy Young asked him for his driver's license and then told Defendant that he needed a passport because he had a Mexican driver's license (Docket No. 29 at 130). In addition, Defendant testified that Deputy Young told him that he was an immigration officer and questioned him about whether he was transporting any illegal drugs or had any illegal firearms (Docket No. 29 at 130-131).

Defendant further testified that he was questioned by Agent Langeland about the firearms found during the search of the vehicle prior to waiving his Miranda rights (Docket No. 29 at 139). In addition, Defendant testified that he did not fully understand his Miranda rights at the time he signed the waiver (Docket no. 29 at 141).

III. <u>Analysis</u>

13

A.  *Terry* Stop

The Defense takes the position that Deputy Young overstepped the bounds of *Terry* by extending the traffic stop to investigate Defendant's immigration status.  More specifically, the Defense asserts that Deputy Young prolonged the traffic stop beyond its justification by starting a drug investigation rather than issuing a citation after the EPIC report came back negative.  In addition, the Defense asserts that the totality of the circumstances fell short of establishing a reasonable suspicion that Defendant was committing a drug offense.

The Government takes the position that it did not overstep the bounds of *Terry* and that the traffic stop was not impermissibly extended.  More specifically, the Government asserts that Deputy Young did not overstep the bounds of *Terry* when he briefly detained Defendant to either confirm or dispel his suspicions that Defendant was engaged in criminal activity.

As indicated above, the Court has already determined that probable cause existed to conduct the traffic stop on August 21, 2006 (Docket No. 28).  Upon making a valid traffic stop, it is well established that an officer may "'conduct an investigation reasonably related in scope to the circumstances that initially prompted the stop.'" United States v. Torres-Monje, 433 F. Supp. 2d 1028, 1032 (D.N.D. 2006)(quoting United States v. Bloomfield, 40 F. 3d 910, 915 (8th Cir. 1994)).  Such investigation may include requesting a driver's license and registration, asking the driver to step out of the car and wait in a patrol car, conducting computer inquiries to determine the validity of a license and registration, obtaining the driver's criminal history, determining if there are any outstanding warrants against the driver, and inquiring as to the driver's destination and purpose, and similar questioning of a vehicle's passengers.  Id.  An officer does not need reasonable suspicion to continue the detention until the initial purpose of the traffic stop is

14

completed.  Id.  A reasonable investigation also can include questioning a driver about his

immigration status so long as such questioning does not prolong an otherwise valid detention.

Id. at 1034 (citing Muehler v. Mena, 544 U.S. 93, 100-101, 125 S. Ct. 1465, 161 L. Ed. 2d 299

(2005)).

      Once the purpose of a traffic stop has been completed, a traffic stop may be extended

beyond its original purpose only if there is reasonable, articulable suspicion that criminal activity

is afoot  to justify further detention.  United States v. Erwin, 155 F. 3d 818, 822 (6th Cir. 1998)

(en banc), cert denied, 525 U.S. 1123, 119 S. Ct. 906, 142 L. Ed. 2d 904 (1999); United States v.

Mesa, 62 F. 3d 159, 162 (6th Cir. 1995).  Reasonable and articulable suspicion exists when an

officer has a particularized and objective basis for suspecting the particular person stopped of

criminal activity.  United States v. Cortez, 449 U.S. 411, 417, 101 S. Ct. 690, 66 L. Ed. 2d 621

(1981).

      In the present case, the Court finds that the traffic stop was not impermissibly extended

when Deputy Young briefly questioned Defendant about his immigration status after receiving

the report from EPIC as the evidence at the Hearing indicates that Deputy Young had a

reasonable, articulable suspicion that criminal activity was afoot.  More specifically, the

evidence presented at the Hearing shows that Deputy Young stopped Defendant at

approximately 1:49 p.m. on August 21, 2006 to investigate a possible lane violation and

registration violation (Video at Hearing).  At approximately 1:53 p.m., and as part of his

investigation of the stop, Deputy Young contacted EPIC to determine the validity of Defendant's

driver's license and vehicle registration (Docket No. 29 at 15-19).  In response to Deputy

Young's inquiry, EPIC indicated that there was no record of Defendant being in the country or

any information on the tags of either the Navigator or the Honda (Docket No. 29 at 15-19). Deputy Young's conversation with EPIC concluded at approximately 2:04 p.m. and at 2:06 p.m. Deputy Young radioed for back-up because his suspicions were pretty high that something else other than a move to Atlanta was going on in the car (Video at Hearing, Docket No. 29 at 19-21). By this time, Deputy Young had evidence from EPIC that Defendant was in the United States illegally and had lied about possessing a valid passport, and that the Navigator was being driven on an expired temporary registration (Docket No. 29 at 19 and 52). By this point in his investigation, Deputy Young also had observed several other factors that made him suspicious of illicit activity, including Defendant's Mexican driver's license, the apparent discomfort of Defendant's girlfriend and her son, the way in which the vehicles were packed, the apparent low value of the Honda in relation to the value of the Navigator and the manner in which it was being towed, and the fact that Defendant was headed from California to Atlanta, a known distribution point for drug cartels from California and Texas (Docket No. 29 at 17-18). Much has been made by the Defense about Deputy Young's mistaken reliance on the Regulation of Inter-American Automotive Traffic and/or the Geneva Convention on Road Traffic (1949) as the basis to prolong the traffic stop to questions Defendant about when he entered the United States.[1] As indicated above, however, the facts presented at the Hearing indicate that Deputy Young's

_____

[1]Both Deputy Young and Agent Lawson testified that it was their understanding that under the Convention on the Regulation of Inter-American Automotive Traffic and/or the Geneva Convention a person may drive on a foreign driver's license for a period of one year after entry into the United States. EPIC's lack of information on Defendant led them to believe that Defendant had been in the United States longer than one year. The Government has since withdrawn its argument that the Convention on the Regulation of Inter-American Automotive Traffic and/or the Geneva Convention entitled Deputy Young to prolong the traffic stop to question Defendant about when Defendant entered the United States in order to determine whether Defendant had been in the United States for more than one year.

16

suspicions at the conclusion of his call to EPIC extended beyond the validity of Defendant's driver's license and potential immigration violation and encompassed a concern about Defendant's general dishonesty and need to determine if something else was going on in the car other than Defendant traveling to Atlanta (Docket No. 29 at 54-55).

The facts further show that at approximately 2:07 p.m. Deputy Young exited his patrol car and returned to Defendant and that his questioning of Defendant at this point also was reasonable and justified the further detention. For instance, the evidence at the Hearing indicated that Defendant was evasive and kept changing his story in response to Deputy Young's further questioning about his immigration status, the type of visa he held, how long he had been in the country, whether he held a passport, and the legal status of his long term girlfriend (Docket No. 29 at 21-22). The evidence at Hearing also indicates that Defendant was evasive regarding why the Navigator was not properly registered and about his true destination (Video at Hearing). In addition, Deputy Young's questioning led him to be concerned about Defendant's lack of gainful employment, means necessary to finance a cross country trip in a Lincoln Navigator and apparent ambivalence about whether a dog search of the Navigator would reveal that it had at some point transported illegal substances (Docket No. 29 at 18, 26, 29 and 223-24, Video at Hearing). As the facts indicate, by the time Deputy Young obtained Defendant's permission to search the vehicles at approximately 2:15 p.m., Deputy Young had further and sufficient evidence to bolster his belief criminal activity was afoot. Furthermore, the facts revealed to Deputy Young during the initial traffic stop clearly justified the eleven minute extension of the stop from the time Deputy Young finished his call with EPIC at 2:04 p.m. until Defendant gave his consent to search the vehicles at 2:15 p.m.

17

Accordingly, the Court finds that the physical evidence seized during the searches of the vehicles on August 21, 2006 should not be suppressed.

B. *Miranda*

The Defense takes the position that Defendant's incriminating statements were taken from him by Agent Langeland in violation of *Miranda*. More specifically, the Defense argues that the evidence shows that Agent Langeland questioned Defendant about the firearms and his immigration status and only Mirandized him afterwards. The Defense also argues that Agent Langeland's testimony that he did not question Defendant about firearms until 5:08 p.m. after Defendant's *Miranda* waiver had been obtained is not credible in light of the fact that Agent Langeland's interview notes state at the top of the page "4:55 p.m." Furthermore, the Defense argues that Agent Langeland's two-step interrogation process violated *Miranda*.

In response to Defendant's arguments, the Government takes the position that Defendant was advised of his *Miranda* rights and provided an adequate waiver of them before admitting to owning the firearms and illegal documents found during the search of the Navigator. The Government also takes the position that it was not necessary to Mirandize Defendant prior to speaking to him about his immigration status because any questioning regarding Defendant's status in the United States did not bear on any potential criminal prosecution but merely established Defendant's alienage and potential violation of an administrative law.

In <u>Miranda v. Arizona</u>, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), the Supreme Court held that in order to protect a defendant's Fifth and Fourteenth Amendment privilege against self-incrimination, the prosecution cannot use statements obtained during custodial interrogation unless the defendant has been given *Miranda* warnings, that is he has the

right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.  Pennsylvania v. Muniz, 496 U.S. 582, 110 S. Ct. 2638, 2643-2644 110 L. Ed. 2d 528 (1990).  "Unless a suspect 'voluntarily, knowingly and intelligently' waives these rights, any incriminating responses to questioning may not be introduced into evidence in the prosecution's case in chief in a subsequent criminal proceeding."  Id. at 2644 (quoting Miranda, 384 U.S. at 444).   The duty to give *Miranda* warnings attaches only when a person is subject to custodial interrogation.  Rhode Island v. Innis, 446 U.S. 291, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980).

The test to determine whether questioning is interrogation for purposes of *Miranda* is whether under all the circumstances of a case, the words or actions of the police are likely to illicit an incriminating response from a Defendant.  Id.  The definition of interrogation extends only to those words or actions on the part of police officers that they know are reasonably likely to elicit an incriminating response.  Id.  It is well established that officers asking routine booking questions reasonably related to the police's administrative concerns are not engaged in interrogation within the meaning of *Miranda,* United States v. Gaston, 357 F. 3d 77, 82 (D.C. Cir. 2004).

The test to determine whether a person is in custody for purposes of *Miranda* turns on whether there is a formal arrest or restraint on freedom of movement of the degree associated with formal arrest.  United States v. Mahan, 190 F. 3d 416, 421 (6th Cir. 1999).  Persons detained pursuant to ordinary traffic stops are not in custody for purposes of *Miranda*.  Berkemer v. McCarty, 468 U.S. 420, 437-441, 104 S. Ct. 3138, 82 L. Ed. 2d 317 (1984); United States v. Saenz, 2000 WL 33725117 (W.D. Tenn. March 22, 2000).

19

With respect to any statements made at the scene of the stop, the Court finds that the statements made by Defendant during the traffic stop are not subject to the dictates of *Miranda* because there was no custodial interrogation of Defendant at that time.  Id.[2]

With respect to any statements made by Defendant to Agent Langeland in response to questioning about his alienage and prior to his *Miranda* waiver, it is routinely found that a suspect is not entitled to *Miranda* warning prior to being questioned about his immigration status.  See, United States v. Salgado, 292 F. 3d 1169 (9th Cir. 2002) (Police officer who was booking Mexican national on criminal charge unrelated to his immigration status did not have to give *Miranda* warnings prior to asking routine booking questions regarding arrestee's birthplace and nationality).  See also, United States v. Ozuna, 170 F. 3d 654 (6th Cir. 1999) (Defendant was not in custody at time of being questioned by immigration and customs inspectors at border so as to entitle defendant to Miranda warnings.)  Where, however, the questioning regarding a suspect's alienage goes to an element of a crime charged and the investigator has reason to believe that evidence of alienage could lead to federal criminal prosecution, failure to give *Miranda* warnings makes statement regarding alienage inadmissible.  See, United States v. Mata-Abundiz, 717 F. 2d 1277 (9th Cir. 1983).

The Court finds that in the present case, Agent Langeland's questioning about Defendant's alienage related directly to an element of a crime which Langeland had reason to suspect that Defendant had committed, possession of a firearm by an illegal alien.  18 U.S.C. § 922(g)(5)(A). In fact, Agent Langeland testified at the suppression hearing that he was interested

---

[2]The Court notes that there is no dispute between the parties that Defendant was in custody when being questioned by Agent Langeland (Docket No. 29 at 108-109).

in the case because it is a violation of Federal law for an illegal alien to be in possession of a firearm (Docket No. 29 at 93).[3] Thus, the Court finds that Agent Langeland's questioning of Defendant about his alienage does not fall within the exception for routine booking questioning. Accordingly, Agent Langeland's failure to give Defendant a *Miranda* warning prior to questioning him about his alienage makes Defendant's incriminating statements in response to Agent Langeland's questioning about his alienage made prior to his *Miranda* waiver at approximately 5:08 p.m. inadmissible at trial.

Having determined that Defendant's pre-*Miranda* statements regarding his alienage are inadmissible at trial, the Court must now determine whether the statements made by Defendant after his *Miranda* waiver at 5:08 p.m. are also inadmissible. In Missouri v. Seibert, 542 U.S. 600, 124 S. Ct. 2601, 159 L. Ed. 2d 643 (2004), the Supreme Court held that *Miranda* warnings given mid-interrogation, after a defendant gave an unwarned confession, were ineffective, and thus the confession repeated after the warnings were given was inadmissible at trial. The Seibert case involved a two step interrogation process where the police protocol for custodial interrogation called for giving no *Miranda* warnings until the interrogation had produced a confession. Seibert, 124 S. Ct. at 2605. In determining whether the strictures of *Miranda* had been satisfied, the Supreme Court held that "the inquiry is simply whether the warnings reasonably convey to a suspect his rights as required by *Miranda*." Seibert, 124 S. Ct. at 2610 (internal quotations and citations omitted). "The threshold issue when interrogators question first and warn later is thus whether it would be reasonable to find that in these circumstances the

---

[3]Defendant has been charged with being an illegal alien in possession of firearms in violation of 18 U.S.C. §922(g)(5)(A). Defendant's alienage status is a key element of the crime charged. 18 U.S.C. §922(g)(5)(A).

warnings could function effectively as *Miranda* requires.... Unless the warnings could place a suspect who has just been interrogated in a position to make such an informed choice, there is no practical justification for accepting the formal warnings as compliance with *Miranda*, or for treating the second stage of interrogation as distinct from the first unwarned and inadmissible segment." Seibert, 124 S. Ct. at 2610 (internal quotations and citations omitted).

The Court finds that the facts of this case are distinguishable from the facts of *Seibert*. In *Seibert*, the police intentionally used the two step questioning process in a deliberate attempt to circumvent *Miranda*. In the present case, the Court credits Agent Langeland's testimony that it was his belief that his questions of Defendant regarding his alienage were in the nature of booking questions that did not require *Miranda* warnings. There is no evidence that Agent Langeland intentionally withheld *Miranda* warnings in order to circumvent the strictures of *Miranda* and obtain a confession from Defendant. Rather, the evidence shows that at 4:55 p.m., prior to questioning Defendant about the illegal firearms and documents found during the search, Agent Langeland gave Defendant a printed version of his *Miranda* rights in both English and Spanish, and that at approximately 5:08 p.m., prior to being questioned by Agent Langeland about the illegal firearms and documents, Defendant signed a waiver of his *Miranda* rights (Docket No. 29 at 101). The Court credits the testimony of Agent Langeland on the sequence and timing of his questioning of Defendant regarding the illegal firearms and documents. The Court further credits the testimony of Agent Langeland that prior to asking Defendant about his possession of the illegal firearms and documents, he explained to Defendant that he did not have to talk to him about the firearms, and that he wanted to make sure that Defendant understood his rights (Docket No. 29 at 119-120). The Court does not find Defendant's testimony that he did

not sign his *Miranda* waiver until after he had been asked about the weapons and that he did not understand his *Miranda* rights credible.

Given that Agent Langeland's motive in questioning Defendant regarding his alienage prior to his *Miranda* waiver was not to circumvent *Miranda,* and that Agent Langeland explained to Defendant that he did not have to talk to him, the Court finds that the *Miranda* warnings furnished to Defendant functioned effectively. Accordingly, all incriminating statements taken from Defendant about his possession of illegal firearms and documents made after his *Miranda* waiver at approximately 5:08 p.m. are not suppressed.

IV.  Conclusion

For the reasons described herein, the Motion to Suppress (Docket No. 20) is GRANTED in part and DENIED in part. The physical evidence seized during the searches of the vehicles on August 21, 2006 is not suppressed. Defendant's incriminating statements in response to Agent Langeland's questioning about his alienage made prior to his *Miranda* waiver at approximately 5:08 p.m. are suppressed and are inadmissible at trial. All incriminating statements taken from Defendant about his possession of illegal firearms and documents made after his *Miranda* waiver at approximately 5:08 p.m. are not suppressed.

IT IS SO ORDERED.

TODD J. CAMPBELL
UNITED STATES DISTRICT JUDGE